UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ADRIENNE CARTER )<br>1032 Phillip Powers Drive )<br>Laurel Maryland, 20707 )<br>    )<br>    Plaintiff, )<br>    )<br>    v. )<br>    )<br>JULIAN CASTRO, SECRETARY )<br>Department of Housing & Urban Development )<br>451 7th Street S.W. )<br>Washington, D.C. 20410 )<br>   .     Agency/Defendant. )<br>    ) | Civil Case No.<br>COMPLAINT For Damages &<br>Declaratory Relief |

COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES

Plaintiff, by counsel, for her complaint against the Defendant, says:

**JURISDICTION**

1. This action is brought pursuant to the provisions of 28 U.S.C.§1331 which provides for the maintenance of a civil action in the United States District Court for a matter arising under the Constitution, laws and treaties of the United States, and 28 U.S.C. §1343(a)(4) to recover damages or secure equitable relief under any Act of Congress providing for the protection of civil rights. More specifically, it involves Title VII of the Civil Rights Act of 1964, and its 1972 and 1991 Amendments, 42 U.S.C. § 2000e et. seq., including 42 U.S.C. § 2000e-16 and §704(a) of Title VII, and the regulations promulgated thereunder, including 29 C.F.R. 1613 et. seq. This action is also maintained under the provisions of the Americans With Disabilities Act Amendment Act of 2008 ("ADAAA"), 42 U.S.C. § 12101 et seq. Additionally, this action is being maintained under the Declaratory Judgment Act, 28 U.S.C.§§2201 and 2202, which authorizes the District Courts to declare the rights and other

1

legal relationships of any interested persons seeking such declaration irrespective of whether further relief could be granted. It has been more than 180 days since the acts complained of were committed. On February 3, 2016, Plaintiff received authorization from the Equal Employment Opportunity Commission ("EEOC") to file this action in U.S. District Court.

2. Venue is present under the provisions of 28 U.S.C. §1391(a) and 42 U.S.C. §2000e-16(c) inasmuch as the Defendant is an officer of the United States and is sued in his official capacity, and the District of Columbia is the place where the acts and omissions giving rise to the claim occurred, and were maintained.

## PARTIES

3. The Plaintiff, ADRIENNE CARTER (hereinafter Ms. Carter), is a Black female. Ms. Carter is a former Staffing Assistant, GS-0301-09, the Office of Public and Indian Housing, Office of Native American Programs ("ONAP"), in the U.S. Department of Housing and Urban Development, located at 451-7th Street S.W. Washington D.C. 20410. She was the target of acts of racial discrimination, reprisal and discrimination on the basis of a disability within the meaning of the ADAAA, of which the Defendant and his agents are aware.

4. The Defendant, JULIAN CASTRO, is the Secretary of the Department of Housing & Urban Development ("HUD"), an agency of the United States Government, and he supervises the subsidiary agencies and organizational components which make up HUD, including the ONAP. He is empowered to appoint and supervise officers and employees of said ONAP, and the challenged actions were committed by his subordinates, agents and employees. He is ultimately responsible for the acts complained of herein and is being sued in his official capacity.

## PROCEDURAL HISTORY

5. On November 4, 2011, Ms. Carter was issued a right to file a formal complaint with the EEOC (the letter was actually mailed on November 10, 2011, per postage stamps). The

letter noted Ms. Carter's claims of a hostile work environment as well as her ADAAA claim. Ms. Carter filed her formal complaint with the EEOC on November 20, 2011.

6. Based upon the notice of proposed removal, Ms. Carter faxed a request to amend her EEO complaint to the EEOC to include a claim of reprisal. On August 10, 2012, EEOC acknowledged that "[b]ased upon a review of the information contained in your client's fax, here complaint is amended to include, whether the agency has participated in retaliatory actions against her when on July 2, 2012, she received a Notice of Proposed Removal for Failure to Maintain a Regular Work Schedule and Failure to Follow Instructions." Thereafter, on September 24, 2012, the Union (AFGE, Local 476) sought arbitration regarding the removal under the collective bargaining agreement.

7. On January 16, 2014, EEOC Administrative Judge Kurt C. Hodges dismissed EEOC No. 570-2012-00223X, **without prejudice** on jurisdictional grounds because a mixed case complaint had been filed relative to Ms. Carter's removal. Judge Hodge stated that Ms. Carter could refile her case with the EEOC at the conclusion of her mixed case, and the EEOC would resume processing "her complaint from the point processing ceased."

8. The arbitrator ruled in HUD's favor on the ADAAA issues but refused to address the reprisal claim, because the agency argued that the reprisal claim was before EEOC and the issue before the arbitrator was solely Rodger Boyd's decision to remove her. On May 11, 2015, the Merit Systems Protection Board (MSPB) affirmed the arbitrator's decision but noted that Ms. Carter was disabled within the meaning of the ADAAA and that the arbitrator's analysis of this issue was flawed. On February 3, 2016, the EEOC affirmed the MSPB decision and issued a right to sue notice.

### STATEMENT OF FACTS

9. On May 27, 2007, Ms. Carter began work in the Office of Native American Programs ("ONAP") at HUD as a GS-303-09. She is a Black female, and was over the age of

forty years when she reported for duty. Prior to assuming her position at HUD, Ms. Carter had been employed at the U.S. Department of the Interior ("DOI"). While at DOI, Ms. Carter suffered from a number of medical ailments for which she had been granted a reasonable accommodation ("RA").

10. During the relevant period in issue, Ms. Carter's first level supervisor at ONAP was Terrance Michael Andrews ("Andrews") a male Caucasian. He became her supervisor in September 2009. Andrews worked under the direct supervision of Rodger Boyd and was physically located in the same office.

11. Before Andrews became Ms. Carter's immediate supervisor, she had been rated "outstanding" or "exceeds fully satisfactory by her prior supervisors. Andrews first appraisal of Ms. Carter was favorable on the three critical elements in her performance appraisal.

12. Thereafter, Andrews raised the number of critical elements in her appraisal to five, and also raised the requirements for a satisfactory completion of work from 70% to 75%.

13. In the new critical elements, Andrews added an element for a correspondence tracking log, which required Ms. Carter to track correspondence originating in the field offices and at headquarters. The duties set forth in this critical element were minor duties of the prior position description Ms. Carter had been operating under and were not grade supportive.

14. On January 27, 2010, Ms. Carter's authorization to Telework was discontinued

15. On Ms. Carter's next appraisal in June 2011, she received a minimally satisfactory on one critical element for the period October 2010 to June 2011.

16. On August 1, 2011, Andrews Placed Ms. Carter on a Performance Improvement Plan (PIP) from July 2011 to November 2011.

17. In October 2011, Andrews claimed that the deficiencies continued and Ms. Carter remained on the PIP. Ms. Carter did not receive a performance rating for 2011, although she should have been given rating under existing regulations after 90 days of being on the PIP.

18. In violation of HUD performance evaluation policy, Andrews extended the PIP for Ms. Carter without reevaluating her performance based upon the first PIP that he had issued.

19. Boyd signed each of Ms. Carter's performance appraisals before her immediate supervisor Andrews signed as the rating official. Boyd was Ms. Carter's second level supervisor according to the organizational chart, and should have been the reviewing official on the appraisal.

20. Ms. Carter suffered from a number of medical and physical ailments, including asthma, high blood pressure, which caused blurred vision, a serious stomach disorder, kidney stones and migraine headaches for which she was under the care of a physician. She made Andrews aware of these ailments, and several of her physicians sent reports and clinical information to the agency on Ms. Carter's behalf.

21. On one occasion, Ms. Carter was rushed from HUD's medical facility to a hospital via ambulance because she was suffering from a serious asthma attack. She had three surgeries of which Andrews and Boyd were aware because she presented them with medical documentation.

22. Andrews was advised by Ms. Carter, in her request for a reasonable accommodation, that she had ailments which impacted upon her leave record, and she supplied him with numerous certificates from her physician which reflected that she had chronic ailments. On numerous occasions, Ms. Carter went to see the nurse at HUD, a fact she advised Andrews of.

23. On February 25, 2011, Andrews placed Ms. Carter of Leave Restriction. The leave restriction required Ms. Carter to furnish a medical certificate each time she took sick leave to see her physician.

24. The union agreement with HUD at the time stated under Section 24.06 (6)(leave restriction) that,"[i]f an employee suffers from a chronic condition which does not necessarily

require medical treatment, although absence from work is necessary, the employee shall not be required to furnish a medical certificate for each absence if a medical certificate of the chronic condition has been previously furnished.  However, the supervisor may periodically require that such documentation be updated."

25. On July 20, 2011, Andrews issued another leave restriction memo to Ms. Carter. This leave restriction memo was also in violation of the above union agreement.  Andrews would place Ms. Carter on AWOL when she was a few minutes late in accordance with the above leave restrictions.  This practice and provision of the leave restrictions were in violation of the union agreement with HUD.

26. Ms. Carter supplied Andrews and HUD with medical information from her physicians relative to her conditions.

27. Prior to being placed on the leave restrictions, Ms. Carter had been allowed to call in as late as 10:30 a.m. if she needed to take leave.  With the leave restriction, Ms. Carter had to request leave by 8:30 a.m., or an hour before her reporting time, or she would be placed on AWOL.

28. On **September 20, 2011**, Andrews issued Ms. Carter a letter of reprimand, dated September 16, 2011, for being one hour late on August 30, 2011, and for not calling in by 8:30 a.m. on that date to indicate that she would be late that day, and for taking three hours off on September 1, 2011, without submitting a leave slip until September 2, 2011.

29. On **September 20, 2011**, Ms. Carter told Andrews that she was going to the EEO office to file an EEO complaint because of the reprimand.  On that same date, Ms. Carter filed a grievance against Andrews based upon the PIP he had issued.  Andrews denied the grievance on September 28, 2011.

30. On **October 26, 2011**, Andrews was advised of Ms. Carter's EEO complaint by a HUD EEO counselor.  At the time, Ms. Carter filed her EEO complaint, she was not in

jeopardy of being removed based upon performance. Andrews decided to seek Ms. Carter's removal in **November 2011**, and went to see Michaela Bratten in the personnel office about removing Ms. Carter. Bratten begins drafting the papers to remove Ms. Carter.

31. When Andrews issues Ms. Carter a memorandum on leave on **December 5, 2011**, she immediately sought a reasonable accommodation ("RA") and asks him to allow her to Telework. Andrews immediately denies Ms. Carter permission to Telework as a RA.

32. Andrews' denial of Ms. Carter's request for a RA becomes a recurring violation of the ADAAA for each day the denial is in place. Mitchell v. Dep't. of Commerce, EEOC Appeal No. 01934120 (March 4, 1994); Frank v. Dep't of Navy, EEOC Appeal No. )1993383 (May 11, 2000).

33. At the time Andrews denied Ms. Carter permission to Telework, Edward V. Fagan, a Caucasian Male employee, who worked directly for Boyd in the same office as Ms. Carter, was given permission to Telework and also had a flexible work schedule which permitted him to report to work as late as 11:30 a.m. Several other employees of ONAP had been given permission to Telework.

34. In January 2012, Andrews continued his efforts to remove Ms. Carter with Darren Muhammed, who had replaced Ms. Bratten, and used her documents.

35. While working with the personnel office to remove Ms. Carter, On January 13, 2012, Andrews extended the leave restriction he had imposed on Ms. Carter.

36. On or about May 2012, HUD gave final approval to the removal of Ms. Carter.

37. In late May **early June 2012**, Ms. Carter again requested a RA to arrive at work at **later than the core beginning work hours of 7:30 a.m. to 9:30a.m.** The decision to remove Ms. Carter had been finalized by this time but not formally issued.

38. When Andrews ruled upon Ms. Carter's May/June 2012 RA request on **June 18, 2012**, he already knew that she was about to be issued the removal notice.

39. Andrews issued a **de facto denial** of Ms. Carter's RA request by advising her that she could arrive as late as **9:30 a.m.**, the end of the regular core hours for which no RA was needed. His denial of Ms. Carter's second request for a RA became a recurring violation of the ADAAA under the above authority.

40. In proposing to remove Ms. Carter, although aware of the option to suspend her, as set forth in the **Douglas** factors, Andrews rejected the suspension option in favor of the more severe sanction of removal, as a means to correct any supposed problem of leave abuse and declined to mitigate Ms. Carter's punishment.

41. On July 2, 2012, Andrews issued Ms. Carter a notice of proposed removal.

42. On July 9, 2012, Ms. Carter requested that another deciding official other than Rodger Boyd be appointed to hear her case, because Boyd had been involved in her performance ratings as well as had been the disapproving official for her request for advanced sick leave due to being hospitalized.

43. On September 12, 2012, Boyd, Ms. Carter's second level supervisor, issues the decision removing her from her position.

44. The decision to remove Ms. Carter did not address the issues of RA and the recurring violations stemming from the denial of Ms. Carter's requests for a RA.

45. The removal decision noted that Ms. Carter had missed 1800 work hours since FY 2010, although the decision found that the majority of these absences were medically related.

46. The decision noted that during the FY 2010 to June 2012 time frame, Ms. Carter had produced over 122 medical certificates covering 1104 hours of missed work.

## COUNT ONE: VIOLATION OF THE ADAAA

47. Ms. Carter adopts by reference ¶¶ 9 through 46 and incorporates them herein as if fully set forth.

48. Ms. Carter had a number of medical and physical ailments, including asthma, high

blood pressure, which caused blurred vision, stomach and kidney ailments, as well as migraine headaches, for which she was under the care of several physicians.

49. Because of the foregoing ailments, she was disabled within the meaning of the Americans With Disabilities Act Amendment Act of 2008, 42 U.S.C. § 12101 et seq (ADAAA).

50. The foregoing ailments created a physical and mental impairment that substantially limited Ms. Carter in one or more major life activities.  She had a record of such impairment and was regarded as having such impairment by HUD.

51.  The medical and physical ailments of Ms. Carter impacted upon her ability to perform her duties, and because the ailments impaired her ability to perform her duties, she requested an RA from her supervisor that would allow her to report for work beyond the core hours of 7:30 a.m. to 9:30 a.m. that all HUD employees without any impairment enjoyed, and which would enable her to maintain an acceptable work schedule.

52. HUD, although recognizing that Ms. Carter had medical and physical ailments and would benefit from a RA, declined to give her the RA she requested to report beyond the core working hours, and instead gave her an RA to report for work between 7:30 a.m. and 9:30 a.m., the core reporting hours set for all HUD employees.   The union voiced its objection to this failure to address Ms. Carter's real medical issues with management.

53. The granting of an RA that matched the core hours that Ms. Carter already enjoyed **was tantamount to a denial of her request for an RA.**

54. The denial of Ms. Carter's request for a RA to report for work after 9:30 a.m. was a violation of the ADAAA.

COUNT TWO: VIOLATION OF THE ADAAA

55. Ms. Carter adopts by reference ¶¶ 9 through 54 and incorporates them herein as if fully set forth.

56. In November 2011, Andrews decided to seek the removal of Ms. Carter on the basis of her time and attendance and went to the HUD personnel office to start the process.

57. In December 2011, Andrews denied Ms. Carter's request for a RA to telework or for more flexible reporting hours.

58. While working with the personnel office to remove Ms. Carter, on January 13, 2012, Andrews extends the leave restriction he had imposed on Ms. Carter.

59. In May 2012, Andrews' request to remove Ms. Carter on the basis of time and attendance is approved.

60. In late May or early June 2012, Ms. Carter again requests a RA to arrive at work at later than the core beginning work hours of 7:30 a.m. to 9:30 a.m. because of her myriad medical conditions and issues. The decision to remove Ms. Carter had been finalized by this time, but not formally issued.

61. When Andrews ruled upon Ms. Carter's May/June 2012 RA request on June 18, 2012, he already knew that she was about to be issued the removal notice.

62. Andrews issues a de facto denial of Ms. Carter's RA request by advising her that she could arrive as late as 9:30 a.m., the end of the HUD regular core reporting hours for which no RA was needed. His denial of Ms. Carter's second request for a RA became a recurring violation of the ADAAA under the above authority.

63. The HUD official assigned to oversee the RA arrangements was wholly unaware that granting a RA of 7:30 a.m. to 9:30 a.m. was not in fact a RA since that time period was already available to Ms. Carter, and all of the other employees of HUD, and was the arrival period she was then operating under.

64. Andrews knew that granting Ms. Carter the RA she sought would eliminate the basis upon which her proposed removal was based.

65. Thereafter, Andrews instituted the removal of Ms. Carter because of attendance

issues related to her medical conditions in violation of the ADAAA.

## COUNT THREE: RETALIATION

66. Ms. Carter adopts by reference ¶¶ 9 through 65 and incorporates them herein as if fully set forth.

67. On September 20, 2011, Ms. Carter was issued a letter of reprimand. On that same date, she advised Andrews that she was going to the EEO office to file a complaint against him. On the same date, she grieved the letter of reprimand under the HUD grievance procedures.

68. On **October 26, 2011**, Andrews is advised of Ms. Carter's EEO complaint by the EEO counselor. At the time, Ms. Carter filed her EEO complaint, and the date Andrews is advised of her EEO complaint, Ms. Carter is not in jeopardy of being removed based upon performance.

69. Within weeks of being advised of the EEO complaint, Andrews decided to seek Ms. Carter's removal, and in **November 2011** went to see Michaela Bratten in the personnel office about removing Ms. Carter. Bratten begins drafting the papers to remove Ms. Carter.

70. The close period in time between Andrews' receipt of notice of Ms. Carter's protected activity and the institution of the removal action against her gives rise to the inference that the two events are related.

71. While working with the personnel office to remove Ms. Carter, on January 13, 2012, Andrews extended the leave restriction he had imposed on Ms. Carter.

72. On or about May 2012, HUD gave final approval to the removal of Ms. Carter.

73. On September 12, 2012, Rodger Boyd, Ms. Carter's second level supervisor, issues the decision to remove her from her position. The union objected to Boyd being the deciding official because of his involvement in rating Ms. Carter's performance as the first level supervisor and disapproving her request for advanced sick leave due to her hospitalization.

74. The initiation of the removal protocol by Andrews was in retaliation for Ms. Carter filing an EEO complaint against him.

75. Andrews' denial of Ms. Carter's January 2012 and May/June RA requests were done to further the retaliatory action to remove her that had already been initiated against Ms. Carter in November 2011.

76. The removal of Ms. Carter because of her protected activity was a violation of Title VII of the Civil Rights Act of 1974 and its 1972 and 1991 Amendments, 42 U.S.C. § 2000e et. seq., including 42 U.S.C. § 2000e-16 and §704(a) of Title VII.

## COUNT FOUR: RACIAL DISCRIMINATION

77. Ms. Carter adopts by reference and incorporates herein as if fully set forth the averments in ¶¶ 9 through 76, above, and further states:

78. In order to better deal with her medical issues, Ms. Carter, an Black female, sought a RA from her supervisor, Andrews, a Caucasian male, to allow her to telework or to report to work after 9:30 a.m., the end of the core hours for reporting at HUD.

79. Andrews refused to permit Ms. Carter to telework or to report for work after the core hour of 9:30 a.m. as a RA.

80. At the time Andrews denied Ms. Carter permission to Telework or report after 9:30 a.m., Edward V. Fagan, a Caucasian Male employee had been given permission to Telework and also had a flexible work schedule which permitted him to report to work as late as 11:30 a.m. Several other employees of ONAP had been given permission to Telework.

81. The refusal to permit Ms. Carter to telework or report later than 9:30 a.m. yet allowing Caucasian employees to telework and report later than 9:30 a.m. was disparate treatment based upon her race and a violation of Title VII of the Civil Rights Act of 1964, and its 1972 and 1991 Amendments, 42 U.S.C. § 2000e et. seq., including 42 U.S.C. § 2000e-16 and §704(a) of Title VII.

## COUNT FIVE: HOSTILE WORK ENVIRONMENT

82. Ms. Carter adopts by reference and incorporates herein as if fully set forth the averments in ¶¶ 9 through 81 above, and further states:

83. After Andrews became Ms. Carter's first line supervisor, he commenced a campaign of harassment to force her to leave her position at ONAP.

84. This campaign consisted of poor performance ratings, leave restrictions, performance improvement plans, reprimands, the denial of RAs and the commencement of a removal action against her after she filed an EEO complaint and grievance against him.

85. The foregoing actions were not taken against any other employee in ONAP.

86. The foregoing actions against Ms. Carter were intended to force her to seek other employment and to leave her position in ONAP.

87. The foregoing actions against Ms. Carter were intended to exacerbate her medical problems and force her to seek other employment and to leave her position in ONAP

81. The foregoing actions created a hostile work environment for Ms. Carter in violation of the ADAAA and of Title VII of the Civil Rights Act of 1964, and its 1972 and 1991 Amendments, 42 U.S.C. § 2000e et. seq., including 42 U.S.C. § 2000e-16 and §704(a) of Title VII.

## DEMAND FOR A JURY TRIAL

Plaintiff seeks a jury trial relative to the above issues.

## CONCLUSION

WHEREFORE, for premises considered, Plaintiff demands that judgment be entered in her favor and against the Defendant,

1). Compensatory damages in the amount of $300,000 for emotional and psychological distress.

2). Placing the Plaintiff in an environment free of hostility and retaliation and enjoining

the Defendant from retaliating further against the Plaintiff.

    3). Enjoining the Defendant from discriminating against the Plaintiff on the basis of age, sex and race.

    4). Declaring that the Defendant's acts, practices, policies and procedures violated Plaintiff's rights as guaranteed under Title VII of the Civil Rights Act of 1964, as amended, and the Age Discrimination and Employment Act.

    5). Awarding Plaintiff reasonable attorney fees.

    7). Granting her such relief as the Court deems just and proper.

February 29, 2016                                     Respectfully submitted

                                                        //S// Charles E. Wagner

                                                        Charles E. Wagner, Esq.
                                                        Counsel for Complainant

Address for Service:
Charles E. Wagner
Silver Spring Centre
P.O. Box 14723
Silver Spring, Maryland 20911
(202) 210-7801
Wagnelliot@aol.com